IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOM W. PARSON,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 15-3942** |
| | : | |
| **THE VANGUARD GROUP,** | : | |
| **Defendant.** | : | |
| | : | |

**MEMORANDUM**

Tucker, C.J.                                                                July 18, 2016

Presently before the Court is Defendant The Vanguard Group's ("Vanguard's") Motion

for Summary Judgment on Plaintiff Thom Parson's claims of employment discrimination.  (Doc.

20.)  Upon consideration of the parties' submissions and for the reasons set forth herein, this

Court GRANTS Vanguard's Motion.

**I.      FACTUAL BACKGROUND**

Plaintiff, an African-American, worked at Vanguard from 1987 to May 12, 2014, when

he was terminated at age fifty-one.  In the last years of his employment, Plaintiff was a Level B

Document Research Processing Associate ("Processor") in Vanguard's Client Relationship

Group.  His responsibilities included completing research requests, maintaining standards for

quality and productivity, and responding to client requests for account histories.  (Def. Mot. for

Summ. J. Ex. A, Statement of Stipulated Material Facts ¶¶ 1-5, Doc. 20-1 [hereinafter SSMF].)

The department in which Plaintiff worked was predominantly white.  (Parson Dep. 104:16–21,

Dec. 15, 2015, Docs. 23-2–23-4; Def.'s Reply Ex. P at VTP000914, Doc. 25-16.)

1

From 2010 to mid-January 2014, Plaintiff reported to Angela Rodden, a Caucasian female born in 1968.  (SSMF ¶ 6.)  Plaintiff received a "Fully Successful" rating on his 2010 year-end appraisal, but Rodden advised him to "[f]ocus on increasing [his] quality by paying attention to the details of the client request."  (Def.'s Reply Ex. C, 2010 Appraisal at P248, Doc. 25-3 [hereinafter 2010 Appraisal].)  In 2011, Plaintiff received the lower rating of "Further Development Needed" on his year-end appraisal.  (SSMF ¶ 14.)  The appraisal noted, "Thom, you are an experienced associate on the Research team but continue to ask questions on how something should be processed.  It would be expected with your tenure and expertise that you should be able to analyze and resolve issues more independently without relying on others."  (Def.'s Reply Ex. D, 2011 Appraisal at P252, Doc. 25-4 [hereinafter 2011 Appraisal].)  It continued, "Thom, another area of development is your decision quality and interpreting client requests . . . [Y]ou need to demonstrate sound logic and organization when solving problems and in your decision making."  (*Id.* at P253.)

Plaintiff's issues at work continued to escalate in 2012.  On February 8, 2012, Plaintiff received a Written Alert for Performance, which noted that he was not meeting decision-making competencies.  The Written Alert explained, among other things, that Plaintiff "continue[d] to ask questions on how something should be processed . . . [and was] not able to make quality decisions when interpreting client requests independently."  (SSMF ¶ 15; Def.'s Reply Ex. E., Written Alert for Performance, Feb. 8, 2012, at VTP000214, Doc. 25-5 [hereinafter 2012 Written Alert].)  A few days later, on February 14, 2012, Plaintiff received a Written Alert for Absence, Lateness, or Dependability for taking excessive unscheduled time off.  (SSMF ¶ 16.)  By May 14, 2012, Plaintiff had resolved the issues underlying these two Written Alerts.  (Def.'s Reply Ex. F, Midyear Update, June 19, 2012, at VTP000182, Doc. 25-6.)  At the end of 2012, however,

Plaintiff received a "Further Development Needed" on his appraisal, which cited his two Written Alerts for Performance and a time when Plaintiff did not follow proper procedures for obtaining work.  Rodden noted that Plaintiff "should continue to focus on meeting department quality and productivity standards *consistently* throughout the year [and that he] continu[e] to broaden [his] knowledge in learning additional functions . . . ."  (Def.'s Reply Ex. G, 2012 Appraisal at P258, Doc. 25-7.)

The relationship between Plaintiff and Rodden became increasingly tense during this time.  In June 2013, Plaintiff asked to meet with Rodden to discuss time off.  At the meeting, after discussing changes at the company, Rodden told Plaintiff, "Vanguard may not be the place for your type." (Parson Dep. 101:11−16.)  Plaintiff felt that "type" as used by Rodden was a reference to his race.  (*Id.* 104:10-13.)  Rodden made another statement several meetings later, stating, "Vanguard may not be the place for you." (*Id.* 103:24−104:3.)  Also, while Plaintiff reported to Rodden, supervisors began called Plaintiff "Willie", the name of Willie Hubert, another African-American employee, and Hubert was often called "Thom."  (*Id.* 117:4-118:5.) One of the supervisors who called Plaintiff by the wrong name was Anthony Perilli, who later became Plaintiff's supervisor.  (Parson Dep. 117:22-118:5.)  These interactions with supervisors gave Plaintiff the impression that he "was being discussed." (*Id.* 117:15.)

On October 1, 2013, Plaintiff received another Written Alert for Performance, which stated that, although Plaintiff had "18 years of experience," he continued to "show inconsistencies in [his] processing," "struggle[d] to make quality decisions and continue[d] to ask many questions on how to process Research requests."  (SSMF ¶ 17; Def.'s Reply Ex. H, Written Alert for Performance, Oct. 1, 2013, at VTP000246, Doc. 25-8 [hereinafter 2013 Written Alert].)  The Written Alert included five competency gaps and examples thereof.  It described an

incident in which Plaintiff received a client request for check images dating 2008 and prior, which should have taken about two hours to complete. Plaintiff instead completed the request by providing checks dated 2008 and later and he took over thirteen hours. (2013 Written Alert at VTP000246–47.) The Written Alert also included an incident when Plaintiff left a priority request incomplete over a weekend without notifying the requester or updating the request status when he could have completed the request by an alternative method. (*Id.* at VTP000247.) Plaintiff also "no actioned" a client request that should have been processed and another associate had to complete it. (*Id.*)

On December 6, 2013, Rodden identified seven additional instances occurring over two days when Plaintiff processed requests incorrectly and needed to reprocess them. (Def.'s Reply Ex. J, E-mail from Angela Rodden to Plaintiff (Dec. 6, 2013, 14:48 EST), Doc. 25-10.) Rodden then contacted her supervisor, Kyle Esterbrook, about issuing a Formal Warning to Plaintiff. (*Id.* Ex. K, Crew Relations Counseling Sessions, Dec. 9, 2013, at VTP000139, Doc. 25-11.) On December 13, 2013, Plaintiff received a Formal Warning for Performance based on his failure to close the competency gaps identified in the October 2013 Written Alert. The Formal Warning stated, "You continue to show inconsistencies in your processing. You struggle to make quality decisions and continue to ask many questions on how to process Research requests." (*Id.* Ex. L, Formal Warning, Dec. 13, 2013, at VTP000208, Doc. 25-12 [hereinafter Formal Warning].) The Formal Warning included three examples of competency gaps observed in the two weeks prior. (SSMF ¶ 18.) First, Plaintiff had received a priority request for a check image, but instead of processing the request right away, Plaintiff contacted the account representative to ask for fund and account numbers, resulting in delays. (Formal Warning at VTP000209.) Second, Plaintiff sent a request to the "No Action" queue when action was needed. (*Id.*) Third, Plaintiff declined

to process a request by citing a new service model, which was erroneous and resulted in inaccurate information and delayed processing.  (*Id.*)  Plaintiff electronically signed the Formal Warning, acknowledging his understanding that "significantly sustained improvement in the areas mentioned must be made immediately. . . . Failure to meet or maintain the required performance standards could result in further disciplinary action, up to and including termination of [his] employment."  (*Id.*; SSMF ¶ 19.)  At the end of 2013, Plaintiff received an appraisal rating of "Further Development Needed."  (Def.'s Reply Ex. M, 2013 Appraisal, at VTP000200, Doc. 25-13.)

In mid-January 2014, Plaintiff's supervisor changed from Rodden to Anthony Perilli, a Caucasian male born in 1967.  (SSMF ¶ 7.)  Rodden, Perilli and Plaintiff met for a transition meeting during which Rodden discussed Plaintiff's work performance.  (Perilli Dep. 17:14–18:8, Jan. 8, 2016, Doc. 23-7.)  After Perilli took on his role as supervisor, he asked Plaintiff why Plaintiff's productivity numbers as reported by Vanguard's Horizon system were low.  Plaintiff responded that the Horizon system was inaccurate.  (Parson Dep. 247:18–22.)  Horizon, a Vanguard reporting system, measured productivity as a ratio between the "functions that an associate performed" as a numerator and the "hours that [the associate is] held accountable for" as the denominator.  (Kerlin Dep. 18:8–18, Mar. 2, 2016, Doc. 23-10.)  Perilli contacted Horizon support personnel to investigate the issue.  He then discovered that the system incorrectly doubled Plaintiff's work hours from 7.5 to 15, which inflated the denominator in Plaintiff's productivity ratio and resulted in lower productivity numbers.  (Perilli Dep. 23:13–24, 26:15–25.)  During the time when Plaintiff's productivity numbers were wrongly reported, Rodden and then Perilli had supervisory access to Horizon.  (Rodden Dep. 9:2–8, 12:13–19, Jan. 8, 2016, Doc. 23-8; Perilli Dep. 29:7–20, 38:4–25; Kerlin Dep. 28:24–29:1.)  Ultimately, neither Perilli

nor the Horizon support team was able to identify the source of the error.  (Perilli Dep. 24:11–12; Kerlin Dep. 31:4–5, 39:6–7.)  Perilli, however, assured Plaintiff that his productivity numbers in Horizon would not count against Plaintiff's performance.  (Perilli Dep. 23:22–24, 31:1–4.)

The Formal Warning from December 2013 was effective until March 13, 2014, but because Plaintiff was on leave for a part of this time, Vanguard extended the warning period to April 9, 2014.  (SSMF ¶ 21.)  On April 9, 2014, Perilli advised Nina Mattson-Thomas, a Crew Relations Specialist in Vanguard's Human Resources department, that Plaintiff had additional "fall out items" since being placed on the Formal Warning.  (*Id.* ¶ 22.)  For example, Plaintiff had failed to monitor the research hotline as assigned, which resulted in twenty-six missed calls and five employees being reassigned to handle the calls.  (*Id.*)  As a result, on May 12, 2014, Mattson-Thomas and Perilli met with Plaintiff and terminated him.  (*Id.* ¶ 23.)

## II.        STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, courts shall grant summary judgment in favor of the moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it is "one that might 'affect the outcome of the suit under governing law.'"  *Smith v. Johnson & Johnson*, 593 F.3d 280, 284 (3d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A dispute as to a material fact is "genuine" if it "is one that 'may reasonably be resolved in favor of either party.'"  *Lomando v. United States*, 667 F.3d 363, 371 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 250).

The movant has the initial "burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact."  *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015).  "Where the defendant is the moving party, the burden is on the defendant to

6

show that the plaintiff has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains its initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a *genuine issue for trial.*'" *Santini*, 795 F.3d at 416 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). When assessing the motion for summary judgment, the court "must construe all evidence in the light most favorable to the nonmoving party." *Id.* Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III.    DISCUSSION

Vanguard moves for summary judgment on Plaintiff's claims, arising under various statutes, of discriminatory termination based on his age and race.[1] The Age Discrimination in Employment Act of 1967 ("ADEA") prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a). Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits employers from similarly discriminating based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). The Pennsylvania Human Relations Act ("PHRA") mirrors the ADEA and Title VII by prohibiting adverse employment actions based on age and race. 43 Pa. Cons. Stat. § 955. 42 U.S.C. § 1981 also combats racial discrimination by "protect[ing] the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts'

---

[1] Plaintiff has chosen not to proceed on his hostile environment and retaliation claims. Pl.'s Resp. to Def.'s Mot. for Summ. J. 14 n.2, Doc. 23.

without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75 (2006)

(quoting 42 U.S.C. § 1981(a)).

> For disparate treatment claims arising under the ADEA, Title VII, the PHRA, and Section
1981, when evidence of discrimination is circumstantial, the court is to apply the burden-shifting
framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Burton*,
707 F.3d at 425–26 (applying *McDonnell Douglas* in an ADEA and Title VII case based on
indirect evidence); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999) (applying
*McDonnell Douglas* to a plaintiff's disparate treatment race discrimination claims under Title
VII, Section 1981, and the PHRA); *see also Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 213
(3d Cir. 2015) ("Claims brought under the [PHRA] are generally interpreted coextensively with
Title VII claims." (internal quotation marks omitted)); *Anderson v. Wachovia Mortg. Corp.*, 621
F.3d 261, 267 (3d Cir. 2010) ("We have previously applied the tests used to evaluate
employment discrimination claims brought under Title VII . . . to employment discrimination
claims brought under § 1981, since 'the substantive elements of a claim under section 1981 are
generally identical to the elements of an employment discrimination claim under Title VII.'"
(quoting *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009)).

> The first step in the *McDonnell Douglas* analysis is for the plaintiff to make a prima facie
case of employment discrimination. *Burton*, 707 F.3d at 426.   At summary judgment, "'the
evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the]
prima facie case.'" *Id.* (quoting *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001)).
The plaintiff makes a prima facie case of age discrimination by showing that: "(1) [he] is forty
years of age or older; (2) the defendant took an adverse employment action against [him]; (3)
[he] was qualified for the position in question; and (4) [he] was ultimately replaced by another

employee who was sufficiently younger to support an inference of discriminatory animus." *Id.*
To make a prima facie case of discrimination based on race, the plaintiff must show that: "(1)
[he] is a member of a protected class; (2) [he] was qualified for the position he sought to attain or
retain; (3) [he] suffered an adverse employment action; and (4) the action occurred under
circumstances that could give rise to an inference of intentional discrimination." *Makky v.
Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

If the plaintiff makes a prima facie case, the burden of production shifts to the defendant
employer to provide a legitimate, non-discriminatory reason for the adverse action. *Burton*, 707
F.3d at 426.  This "relatively light" burden "is satisfied if the employer provides evidence,
which, if true, would permit a conclusion that it took the adverse employment action for a non-
discriminatory reason." *Id.*  The defendant does not, however, need to prove that the preferred
reason actually motivated its conduct. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,
254 (1981).

If the defendant carries its burden of providing a legitimate non-discriminatory reason for
its conduct, the burden of production shifts back to the plaintiff to demonstrate that the proffered
reason is pretextual. *Burton*, 707 F.3d at 426.  "To make a showing of pretext, 'the plaintiff must
point to some evidence, direct or circumstantial, from which a factfinder could reasonably either
(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious
discriminatory reason was more likely than not a motivating or determinative cause of the
employer's action.'" *Id.* at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).
"[I]f the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered
reasons, to survive summary judgment the plaintiff need not also come forward with additional
evidence of discrimination beyond his or her prima facie case." *Fuentes*, 32 F.3d at 764.

9

Therefore, the plaintiff need not present direct evidence of discriminatory animus to show pretext and survive summary judgment. *Burton*, 707 F.3d at 427.

### A. Vanguard is Entitled to Summary Judgment on Plaintiff's Age Discrimination Claims

The Court first addresses Vanguard's motion for summary judgment on Plaintiff's age discrimination claims. The parties do not dispute the first three elements of Plaintiff's prima facie case, namely, that Plaintiff is over 40 years old, Vanguard terminated his employment, and Plaintiff was qualified to be a Processor. (*See* Def.'s Mot. for Summ. J. 3.) Vanguard focuses on the fourth element, arguing that Plaintiff lacks sufficient evidence to support an inference of intentional age discrimination. This Court agrees. Plaintiff's briefing fails to point to any specific fact to suggest that Vanguard terminated Plaintiff because of his age. Indeed, the Court's review of the record uncovers little to support any inference of age discrimination.[2]

---

[2] At Plaintiff's deposition, Vanguard's counsel questioned Plaintiff about whether he heard comments from Angela Rodden, Anthony Perilli, or Nina Mattson-Thomas to suggest a bias against individuals based on their age. Plaintiff answered in the negative. (Parson Dep. 123:11-125:18 (Rodden), 125:19-126:3 (Perilli), 128:3-129:19 (Mattson-Thomas)). In answering these questions, Plaintiff kept referring not to age bias, but to racial bias:

> Q: Did anyone ever tell you that they had heard Angela Rodden say something that suggested a bias by her against people because of their age?
>
> A: Well, the only other people that would have had something to say were whites on the staff. So I don't think it would have been anything to concern them and I wouldn't see why she would have brought anything up to them either. . . .
>
> Q: Did anyone ever tell you they heard Nina Matson-Thomas [sic] say something that suggested she had a bias against people because of their age?
>
> A: Conversations about Nina would be, since Nina is black, that she should be ashamed of herself because she seems to have no problem in effect helping Vanguard with the removal of the blacks.

(*Id.* 124:13–22, 128:10–19.)

In later testimony, Plaintiff stated that age may have been a factor for Perilli's conduct, but he again turns to race:

> Q: Now, with Tony Perilli, did you think that he had a bias against you because of your age?
>
> A: I would not doubt for one second that age—that age would have come into play, and that's another case it was always hard to understand who was being forced out, you know, the first three blacks that I mentioned before, yet we worked in a department where there were three gentlemen that were the age of 60 years old. Well, two were 60. One was possibly 59. And they – they went through their day with enjoyment. . . .
>
> Q: And what are you saying about those three people?
>
> A: I'm just saying that those were three white individuals that never seemed to have any issues, never seemed to have any problems. When [three African-American employees] were pushed out, it was like, oh, they're getting rid of them because they're the oldest ones.

Plaintiff has therefore failed to present a prima facie case of discrimination and Vanguard is entitled to summary judgment on Plaintiff's ADEA and PHRA age discrimination claims.

### B. Vanguard is Entitled to Summary Judgment on Plaintiff's Race Discrimination Claims

The Court next addresses Vanguard's motion for summary judgment on Plaintiff's race discrimination claims. Again, Vanguard does not dispute the first three elements of Plaintiff's prima facie case. It argues, however, that Plaintiff provides no evidence to support an inference of racial discrimination. Plaintiff responds that he worked for over two decades without issue until Rodden became his supervisor, which is when his performance problems began. (*Compare* 2010 Appraisal at P248 (noting a rating of "Fully Successful"), *with* 2011 Appraisal at P253 (noting a rating of "Further Development Needed").) Rodden made a comment to Plaintiff, which he took to be racial in nature, stating, "Vanguard may not be the place for your type." (Parson Dep. 101:11–16.) Several supervisors, including Perilli, called Plaintiff by the name of another black male in the department. (Parson Dep. 117:4–118:5.) And Plaintiff's productivity was erroneously calculated in Vanguard's Horizon system, which his supervisors had the ability to manipulate. (Perilli Dep. 29:7–20; Rodden Dep. 9:2–8, 12:13–19; Kerlin Dep. 28:24-29:1.) Together, Plaintiff argues, these facts support an inference of racial discrimination by supervisors at Vanguard. The Court agrees that Plaintiff's performance began to decline only under Rodden's supervision, who had commented on Plaintiff's "type." Construing the evidence in the light most favorable to Plaintiff, the Court also finds that supervisors calling Plaintiff the wrong name and erroneous reporting in Horizon could give rise to an inference of discrimination. *See Burdine*, 450 U.S. at 254 ("[T]he prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the

---

(*Id.* 265:14–266:24.) Upon consideration of Plaintiff's testimony and the record of this case, the Court fails to find specific facts upon which to infer that Vanguard terminated Plaintiff because of his age.

consideration of impermissible factors." (internal quotation marks omitted)).   Accordingly, the

Court finds that Plaintiff has presented sufficient evidence to establish a prima facie case of race

discrimination.  *See id.* at 253 ("The burden of establishing a prima facie case of disparate

treatment is not onerous.")

The burden of production now shifting to Vanguard, Vanguard articulates that its

legitimate, non-discriminatory reason for Plaintiff's termination was his "continued poor quality

of work."  (Def.'s Reply in Supp. of Mot. for Summ. J. 21, Doc. 25.)  Vanguard points to

Plaintiff's poor year-end appraisals for 2011, 2012, and 2013 and his receipt of two Written

Alerts and a Formal Warning.  Underlying these disciplinary actions was Plaintiff's "failure to

demonstrate sound judgment, failure to expand his job knowledge to allow him to work

independently, and failure to learn from his own experience."  (*Id.*)  The record supports

Vanguard's contentions.  (*See* 2011 Appraisal at P252 ("Thom, you are an experienced associate

on the Research team but continue to ask questions on how something should be processed.");

2012 Written Alert at VTP000214 ("Thom, you . . . continue to ask questions on how something

should be processed.  You are not able to make quality decisions when interpreting client

requests independently."); 2013 Written Alert at VTP000246 ("You struggle to make quality

decisions and continue to ask many questions . . . . Does not demonstrate sound judgement [sic]

in making decisions on how to process requests . . . . Does not take responsibility to learn and

improve."); Formal Warning at VTP000208 ("You struggle to make quality decisions and

continue to ask many questions on how to process Research requests."); Def.'s Reply Ex. Q,

Crew Relations Counseling Sessions, May 12, 2014, at VTP000160, Doc. 25-17 (noting

"Thom's separation from VG [Vanguard] due to unsatisfactory performance")).  The Court

therefore finds that Vanguard presents sufficient evidence to support a legitimate, non-discriminatory reason for Plaintiff's termination.

Plaintiff now bears the burden of showing that Vanguard's articulated legitimate reason—his deficient work performance—was pretextual. As discussed, Plaintiff may make this showing in one of two ways by identifying evidence from which a factfinder could reasonably either (1) disbelieve Vanguard's proffered justification, or (2) believe that racial animus was more likely than not a motivating or determinative cause of Plaintiff's termination. *Burton*, 707 F.3d at 427. If a plaintiff attacks the credibility of an employer's articulated legitimate reasons for its action, his evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's preferred legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (internal quotation marks and citation omitted). To make this showing, Plaintiff here relies on the same evidence upon which he based his prima facie case of race discrimination.

This Court concludes that Plaintiff has not carried his burden of demonstrating pretext. First, Plaintiff cites his work history prior to Rodden's supervision, during which Plaintiff never received any discipline. This, however, neither contradicts Vanguard's contention that Plaintiff's performance declined in the last years of his employment nor is probative of discrimination. *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 474 (3d Cir. 2005) ("The attempt to use past positive performance reviews to show that more recent criticism was pretextual fails as a matter of law.") Plaintiff himself admits that his performance at the end of his employment changed: "I said it was like tripping at the finish line[,] there were a few mistakes that were made," and "there probably was a mistake or two, but I had been doing so well and as I said, I tripped right in front

13

of the finish lane [sic]."  (Parson Dep. 280:14–16, 282:3–7.)  For example, Plaintiff admits that

he failed to monitor the research hotline on his assigned day, which was one of the infractions

resulting in his termination.  (SMF ¶ 22; Parson Dep. 299:9–16.)

Second, Plaintiff states that his negative appraisals, Written Alerts, and Formal Warning

occurred under the supervision of Rodden, a Caucasian supervisor, who commented that

Vanguard may not be the place for Plaintiff's "type."  Plaintiff implies that Rodden targeted her

criticism at him because of his race and it was her negative evaluations that resulted in his

eventual termination.  The evidence, however, does not show how discriminatory animus was

part of the decision-making process surrounding his termination.  Rodden did not have any hand

in the decision to terminate Plaintiff.  Rodden's comment about Plaintiff's "type," made

approximately eleven months prior to his termination, is unrelated to the termination decision

and best characterized as a "stray remark," which does not bear great weight in a pretext

analysis.  *Kargbo v. Phila. Corp. for Aging*, 16 F. Supp. 3d 512, 528 (E.D. Pa. 2014) (quoting

*Hook v. Ernst & Young*, 28 F.3d 366, 375 (3d Cir. 1994)) (defining "stray remarks" as

"[s]tatements divorced from the employment decision" and noting how stray remarks "can be

considered as part of the evidence of pretext, but alone are insufficient to show racial animus").

Stray remarks, in combination with evidence to discredit an employer's legitimate non-

discriminatory reason, may support a showing of pretext.  *Id.*  As this Court will continue to

discuss, however, Plaintiff has not provided sufficient evidence to disbelieve that Vanguard

terminated him because of his poor performance.

Third, Plaintiff presents evidence that Perilli and other supervisors called him by the

name of another black male employee, Willie Hubert, arguing, "This is clear evidence of racial

bias by Pirelli [sic]."  (Pl.'s Resp. at 17, Doc. 23.)  The Court, however, is not convinced.

Plaintiff's testimony describes these incidents as mistaken identifications rather than examples of racial bias.[3]  This evidence is therefore insufficient to allow a disbelief that Perilli terminated Plaintiff for his performance or to show that racial discrimination was more likely than not a determinative cause of Plaintiff's firing.  Plaintiff also points to his observations that Vanguard "fired or forced out" thirteen employees from his department and eleven, including him, were African-American.  (*Id.*)  It is true that "statistics as to [a defendant's] employment policy and practice may be helpful to a determination of whether [a defendant's action] conformed to a general pattern of discrimination against blacks."  *McDonnell Douglas Corp.*, 411 U.S. at 805.  Without more information about whether these former Vanguard employees were adequately qualified for their positions, however, this Court cannot conclude that Plaintiff's observations are probative of discrimination.[4]  *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509,

---

[3] Plaintiff's testimony included the following:

A:  There are a host of other supervisors on the other side that just didn't know me.  After Supervisor Rodden arrived, I just started to notice more of them started to speak to me and say hello to me and, you know, I just thought it was odd at first and then it got to the point where—they weren't calling me Thom.  They were calling me Willie.  And honestly, it was every one of them.  And then they would see Willie and they would call him Thom.

So the mindset was that why does everybody know us all of a sudden, you know, why are they speaking to us, and it just kind of started to give me the mindset that I was being discussed. . . .

I hadn't known Tony Perilli at this point either.  Tony was calling me Willie, calling Willie Thom. . . .

I—it annoyed me.  I thought it was disrespectful.

Q:  Okay.  You thought it was disrespectful that they were calling you by the wrong name?

A:  They were calling me—yeah.  To me we look completely different and I resented it and Willie would just laugh and laugh . . . That's just something that annoyed me, that's all, but with that it made me believe—again, these were not people that spoke to me before Angela Rodden arrived. . . .

Q:  [W]hen these individuals called you by the wrong name, did you ever correct them and tell them your correct name?

A:  Normally—I don't think I did.

Q:  Okay.  Why not?

A:  There's something that was—in me that was like, well, I don't want them to look foolish.  So I just said hi and just— my mindset was that we looked nothing alike.

(Parson Dep. 116:22–121:8.)

[4] Further, regarding the circumstances surrounding the departure of ten other black employees, Plaintiff's evidence is either speculative or based on hearsay.  Two of the employees had spoken directly with Plaintiff about their decision to retire after their supervisors harassed and/or threatened them regarding their competency.  (Parson

542–43 (3d Cir. 1992) (rejecting a plaintiff's "raw numerical comparisons" to support pretext when they "are not accompanied by any analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period").

Fourth, Plaintiff points out how Rodden "made sure to make it clear to Pirelli *right out of the gate* when he replaced her as Plaintiff's manager that Plaintiff was—in her eyes—a poor performer." (Pl.'s Resp. at 17.) Plaintiff relies on Perilli's testimony:

> Q: And when did you first begin perceiving that there may be a performance problem with Thom?
> A: That was introduced to me when Thom, myself and Angela first met.
> Q: And how did that occur?
> A: That was our transition meeting. . . .
> Q: To the best of your ability, can you relate to me what was discussed about it? . . .
> A: Angela presented me with what was written on the formal warning, that Thom—had been issued to Thom. I don't recall the specifics of the situation—the situations, but I know there were seven/eight, maybe, incidents that were documented in that document.

(Perilli Dep. 17:14–18:8.) This evidence, however, does not show pretext. It neither demonstrates racial animus nor discredits Vanguard's legitimate, non-discriminatory reason for terminating Plaintiff. Rather, Rodden's conduct during her transition with Perilli concerned Plaintiff's work performance, which is a legitimate ground for their meeting and supports Vanguard's assertion that Plaintiff's termination resulted from performance issues.

Fifth, Plaintiff refers to the erroneous reporting of Plaintiff's productivity in the Horizon system as evidence of pretext. Plaintiff asserts that Rodden and Perilli had supervisory access to Horizon such that they could improperly lower Plaintiff's reported productivity. Plaintiff's conclusion is that, because Rodden and Perilli could have altered his productivity numbers, they

---

Dep. 139:22–142:20; Def.'s Reply Ex. W at 10.) Another had discussed taking an early retirement because he was "made to be so miserable[.]" (Parson Dep. 152:11.) Plaintiff attended the retirement party of two others. (*Id.* 155:7–18, 155:16–21, 157:2–14.) Three departed without explanation. (*Id.* 154:1–5, 158: 11–17, 172:16–22.) And Plaintiff learned of the termination of two others through coworkers. (*Id.* 146:8–11, 171:10–15.)

did so to create false grounds for termination.  Plaintiff's position, however, is speculative and not supported by the record.  Testimony provided by Michael Kerlin, a member of the Horizon support team, shows that it is unlikely that Rodden or Perilli sabotaged Plaintiff's productivity numbers.  Kerlin attempted to replicate the error manually by doubling an associate's work hours, but was unable to.  (Kerlin Dep. 29:4–23.)  He found no evidence that Perilli had doubled Plaintiff's work hours in Horizon and ruled out the likelihood that any human intervention caused the error.  (Kerlin Dep. 49:25–50:18, 29:2–23.)  Further, Plaintiff provides no evidence that his incorrect productivity numbers contributed to his termination.  (*See* Parson Dep. 254:4–7, 257:19–258:1 ("Q: Did there come a time when Tony told you that the Horizon numbers are off the table? A: Yes."); Perilli Dep. 23:22–24.)  Indeed, his termination rested primarily on the inconsistent quality of Plaintiff's work and his failure to use sound judgment.  (*See* Def.'s Reply Ex. P, Request for Termination, Doc. 25-16.)  Even if Plaintiff had strong productivity numbers, it does not contradict Vanguard's assertion that his termination was for performance since one can be productive without producing quality work.

Upon consideration of Plaintiff's evidence purporting to show that Vanguard's legitimate non-discriminatory reason for termination was pretextual, this Court does not find it sufficient to defeat summary judgment.  Based on the evidence, a factfinder cannot reasonably conclude that Vanguard's articulated justification was unworthy of credence or that discriminatory animus was more likely than not a motivating factor in Plaintiff's termination.  Accordingly, Vanguard is entitled to summary judgment on Plaintiff's race discrimination claims under Title VII, the PHRA, and Section 1981.

**IV.      CONCLUSION**

      For the reasons set forth herein, the Court concludes that Plaintiff has failed to present specific facts to show there is a genuine issue for trial and Vanguard's motion for summary judgment is GRANTED.